**Oliveras v. Oliveras**

C.P. of Berks County, no. 08-10063 #3.

*John J. Grenko*, for plaintiff.

*E. Jay Tract*, for defendant.

LASH, *J.*, November 18, 2010—A custody trial was held on October 12, 2010 and November 16, 2010. This court enters the following findings of fact:

## I. FINDINGS OF FACT

1. Plaintiff, Krystal Lynn Thomas Oliverass (hereinafter "mother"), is an adult individual who currently resides at 618 Buttonwood Street, Reading, Berks County, Pennsylvania, moving into the residence in early November 2010. Previously, she resided at 828 Green Street, Reading, Berks County, Pennsylvania 19601.

2. Defendant, Joshua Oliveras (hereinafter "father"), is an adult individual who currently resides at 905 Greenwich Street, Reading, Berks County, Pennsylvania, since November 1, 2010. Previously, father resided at 406 Community Drive, Apartment L, Shillington, Berks County, Pennsylvania 19607.

3. The parties are the natural parents of a minor child, Zahavah Lynn Oliveras, born September 22, 2006 (hereinafter "minor child").

4. The parties are currently husband and wife, separating during the summer of 2008. They began residing together in June 2006 when father moved in with mother in the home of the maternal grandparents. The couple then relocated to their own apartment in Jamestown Village, Reading, Berks County, Pennsylvania, in October 2006 and resided together since that time until their separation in the summer of 2008.

5. Mother currently resides with her paramour, Darriel Everett. The couple have been together for approximately two and one-half (2 1/2) years. The couple have a child, Zanovia, born February 23, 2010. They reside in a five (5) bedroom house.

6. Father currently resides in a two (2) bedroom home, with his paramour, Amanda Lopez, the couple's minor child, Joshua Oliveras, Jr., born December 30, 2009, and the subject minor child. Father's sister, Sasha Lynn Lopez, lives on the third floor of the same building.

7. Mother and father reside in the Reading School District.

8. Mother is employed by the Reading School District as a lunch aid working Monday through Friday from 7:00 a.m. to 1:30 p.m.

9. Father is employed with Wells Fargo as a bank teller, with hours of Mondays through Fridays from 9:00 a.m. to 5:00 p.m. and every other Saturday from 10:00 a.m. to 4:00 p.m. Father also is enrolled at Berks Technical Institute, studying computer programming.

10. Each party has filed protection from abuse petitions against the other. On August 6, 2008, after hearing held, this court entered a protection from abuse order in favor of father and against mother. The order provided temporary custody provisions, awarding primary physical custody of the subject minor child to father, with mother to have partial custody as agreed through mother's sister, Nicole. The order was due to expire on August 6, 2011.

11. On August 13, 2008, the aforesaid final protection from abuse order was modified to provide that mother's

partial custody would be from Monday through Friday from 9:00 a.m. until 1:30 p.m., and every other weekend, from 8:00 a.m. Saturday until 6:00 p.m. Sunday. Mother's sister, Nicole, was to continue to act as intermediary. The order also prohibited mother's brother, Joseph Thomas, from having any contact with the minor child and also prohibited the minor child to be at the home of the maternal grandmother.

12. The final protection from abuse order was again modified on September 8, 2009, to provide that mother's partial custody would be every other weekend from 9:00 a.m. to 7:00 p.m. on Saturdays and Sundays, plus every Wednesday from 3:00 p.m. to 7:00 p.m., thereby eliminating overnight visits.

13. Mother filed three (3) separate protection from abuse petitions against father, all of which were dismissed.

14. Berks County Children and Youth Services implemented a safety plan, dated September 17, 2008, for mother, requiring that the minor child have no contact with mother's brother, Joseph Thomas. The safety plan also provided that mother would meet the minor child's needs and that mother would refrain from drug or alcohol use while supervising the minor child.

15. A court ordered independent psychological evaluation was performed by Alison L. Hill, Ph.D., a licensed psychologist, of Berks Counseling Associates, P.C. In compiling information, Dr. Hill interviewed the parties, mother's paramour, Darriel Everett, father's paramour, Amanda Lopez, observed the minor child interacting with each parent, had the parents fill out a parent questionnaire, received collateral documents from the parties, obtained

criminal record checks and child abuse history clearance forms on the parties, and administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), and the Parent Awareness Skills Survey (PASS). The interviews were conducted on several occasions spanning June through September 2009. Dr. Hill submitted a written report, which was admitted into evidence, and also testified at trial.

## II. DISCUSSION

At issue is primary physical custody. In making disposition, this court considered the testimony of the parties, the testimony and written evaluation submitted by Dr. Hill, and the exhibits provided.

Mother seeks to obtain primary physical custody, or at least a 50/50 shared custody arrangement. She testified that she can properly tend to the minor child's needs and would like the opportunity to do so. She states that she has been thwarted from access to the minor child by father, who obtained a protection from abuse order against her and then has failed to honor the custody schedule provided for in the protection from abuse order. In fact, during the past month, she had only one (1) opportunity to spend time with the minor child.

Mother believed that father does not have a valid reason for denying her visits, that the problem stems from animosity between the parties, and father being influenced by his friends. Mother notes that father often turns the minor child over to the paternal grandmother rather than watch her himself.

Father testified that he has been the caretaker for the

minor child since her birth. When the parties resided together, he was responsible for all of her daily maintenance, taking her to doctor visits, and so forth. Mother was uninvolved. After the parties' separation, mother would not show up for her scheduled custody visits.

Father also testified that if mother had extensive time with the minor child, her care would be substandard. He does not believe that she has the capacity to be a proper parent, believing that her motivations are to make things as difficult for him as possible. Often when the parties interact, mother becomes volatile, making it difficult, if not impossible, for father to communicate with her.

Father also notes that mother's brother, Joseph Thomas, has been found to be involved in improprieties involving children. CYS has implemented a safety plan designed to prohibit Mr. Thomas from having any contact with the minor child. Father believes that mother would not honor this safety plan.

Dr. Hill provided impressions regarding the parties, the parties' respective interactions with the minor child, as well as the parties' paramours. Regarding father, she observed that he is struggling to establish himself, particularly regarding employment, financial, and housing issues. She also noted that he has self-esteem issues and deep rooted feelings of alienation, which hinder his ability to interact with others. On the other hand, Dr. Hill noted that father and the minor child have a very strong bond and that his interaction with her is appropriate. He spends a good deal of time with the minor child, teaching her and assisting her with tasks. Dr. Hill concludes that father is a caring and active parent who loves the minor child and clearly

wants what is best for her.

Dr. Hill found that father's paramour, Amanda, while young and immature, has a good relationship with the minor child and can perform adequately in caring for her.

In contrast, Dr. Hill found mother to be confused, with poor attention span, and ability to focus. Her reality orientation is poor and she engages in what Dr. Hill calls "magical thinking." She is considered to be in chronic psychological distress, with social alienations, and thought processes that are abnormal, resulting in poor judgment and unpredictable behavior. She reports mother to be "generally unreliable and unstable." Dr. Hill was critical of mother's actions during an interview designed to observe mother's interaction with the minor child, as she focused on providing negative information on father and his paramour, interacting minimally with the minor child during the session. Dr. Hill states that mother was observed to "pull [the minor child] up by the arm more than once, made inappropriate and negative statements in front [the minor child], experiencing difficulty getting [the minor child] to do what she wanted to do and then made threats of timeout on which she did not follow through." Although there is a bond between mother and the minor child, it is not a close one.

Mother's paramour was considered to be fairly positive, although he has had little contact with the minor child and had little knowledge of her.

Dr. Hill recommends that the current custody arrangement remain the same, with father retaining primary physical custody and mother having partial custody. However, no overnights or additional time is

recommended for mother.

The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello*, 666 A.2d 1096, 1098 (Pa. Super. 1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton*, 659 A.2d 1040, 1042 (Pa. Super. 1995).

Both of these parties have substantial issues. Both parties have been somewhat transient, moving residences primarily due to financial constraints. Each has psychological and parenting limitations, as more fully outlined by Dr. Hill. Most importantly, the parties are unable to get along, with most interactions resulting in arguments and altercations. Mother is still subject to a PFA order entered on father's behalf. Mother has had infrequent contact with the minor child in recent months, which she attributes to father refusing to provide access, which father attributes to mother refusing to show up for the transfers, and which both attribute to the continuing animosity of the parties. This problem highlights the level of immaturity of these parties.

We conclude that mother has not established a basis for transferring primary custody to her or for otherwise substantially modifying the current order. The evidence shows that father has some rudimentary parenting skills and has been able to provide an adequate home for the minor child. While father's track record is not optimal and while he needs to examine his own conduct in the

continuing problems with mother, on balance, this court is satisfied that the minor child's needs can be met by father. On the other hand, mother has failed to establish that she can provide a suitable home. Dr. Hill's report of mother was extremely critical. Her conduct when interacting with father is also subject to criticism, particularly as she appears to be the catalyst in the altercations. For her to establish herself as a proper parental figure, she will need to accept responsibility for her behavior, then change in a positive way. This may require parenting counseling or some other type of counseling that will assist her in reaching this goal.

We need to modify the order to account for father's employment schedule. Additionally, as mother is available during the afternoon while father is working, there is no reason why mother cannot assume custody of the minor child during these periods. At this time, overnight visits are not deemed appropriate.

We enter the following order:

### ORDER

And now, November 18, 2010, after trial held, custody of the parties' minor child, Zahavah Lynn Oliveras, born September 22, 2006 (hereinafter "minor child"), shall be as follows:

1. The parties shall share legal custody of the minor child.

2. Defendant, Joshua Oliveras (hereinafter "father"), shall have primary custody of the minor child.

3. Plaintiff, Krystal Lynn Thomas Oliveras (herein-

after "mother"), shall have partial custody as follows:

A. Every other weekend on Saturday from 9:00 a.m. to 7:00 p.m., then on Sunday from 9:00 a.m. to 7:00 p.m.,

B. During father's work hours when mother is not working, Monday through Friday from 2:00 p.m. to 5:15 p.m., until the minor child reaches school age,

C. Every Wednesday from 5:15 p.m. to 7:00 p.m., and

D. At such other times as the parties may agree.

4. Mother shall have custody every Mother's Day and father every Father's Day from 9:00 a.m. to 7:00 p.m.

5. Mother shall have Christmas Day each year from 1:00 p.m. to 7:00 p.m.

6. The parties shall alternate the following named holidays from 9:00 a.m. to 7:00 p.m., with father having the first holiday after the date of this order: Easter, Memorial Day, July 4th, Labor Day, and Thanksgiving.

7. The holiday schedule shall take precedence over the regular custody schedule.

8. The protection from abuse order entered in this case against mother shall be modified to provide for the aforesaid custody schedule.

9. The custody exchanges shall take place at Burger King at Fifth Street and Green Terrance in Reading, Berks County, Pennsylvania, or at such other locations agreed to by the parties in writing.

10. At no time shall mother's brother, Joseph Thomas, be permitted to have any contact with the minor child.

11. This order shall be considered a final order finally resolving the issues raised in mother's complaint for custody.

12. The attached appendix shall be made a part of the within order.